Filed 8/24/18; Modified and Certified for Partial Pub. 9/13/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JOE RIBAKOFF, | B279462 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC610000) |
| v. | |
| CITY OF LONG BEACH et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed.

Joe Ribakoff, in pro. per., for Plaintiff and Appellant.

Alvarez-Glasman & Colvin, Roger A. Colvin, Vincent C. Ewing and Araceli Almazan for Defendants and Respondents.

————————————

Joe Ribakoff, a frequent attendee at meetings of the Long Beach Transit Company Board of Directors, filled out a public speaker's card and spoke on agenda item 10 at the board's August 24, 2015 meeting for the three minutes allowed each public speaker on an agenda item. When he rose to speak a second time on the same agenda item, it was during the board's deliberation and voting period. He was not permitted to speak, and, after a short exchange with the chair of the board, left the speaker's podium with the verbal assistance of a Long Beach Police Officer who routinely provided security for meetings. Later, Ribakoff filed this action, asking that we reverse the trial court and determine that the board's three-minute limit on public speakers is contrary to state statutes and federal and state free speech principles. We find neither statutory nor constitutional violations, and affirm.

## FACTUAL BACKGROUND

The cause was tried to the court on August 5 and 8, 2015.

## I.     Plaintiff's Case-in-chief

Debra Anne Johnson (Johnson), the Deputy Chief Executive Officer of the Long Beach Public Transportation Company (LBTC), has worked for the LBTC since May 2014. She is familiar with its bylaws and has attended every board meeting while an employee of LBTC. The LBTC is managed by a board of directors (Board). At the beginning of the public comment section of each meeting of the Board, the Board chair "generally describes the process in which public comment will be accepted," including the rules to be followed. Johnson is not aware of any

2

criminal laws being "enforced" at a meeting of the Board; nor does she recall being present at a meeting at which the Board voted on amending its rules on comments from the public. Typically, there are one or two members of the public who address the Board, either on an item on the agenda, or in the section of its meetings reserved for general comments by members of the public. The greatest number of members of the public who have spoken at a meeting is five. In only two instances that she recalls has there been "disturbing speech," which she described as a member of the public speaking for more than the allotted three minutes. On these occasions, the Board concluded its business notwithstanding the interruptions.

The Board held its regular monthly meeting on August 24, 2015, in the Long Beach City Council Council Chamber. Item 10 on the agenda that day concerned coordinating transit fares with other providers of transit services in Los Angeles County by adoption of the transit access program (utilizing "TAP cards") for patrons of the Long Beach Transit System buses to coordinate with bus service offered to patrons of other public transit services in Los Angeles County.

Ribakoff was in attendance, as had been his practice during the preceding two-and-a-half years. Prior to speaking that afternoon, Ribakoff had filled out the card required of all members of the public who wished to address the Board. The card contained a statement that the speaker would have three minutes in which to address the Board. Also, prior to Ribakoff speaking, the Board secretary advised him that he would have three minutes to address the Board on item 10. Staff members of the Board, and others invited to speak on item 10, addressed the Board concerning the item before and after Ribakoff; they were

not limited to three minutes each. Thereafter, the Board began consideration of the matter, with the chair of the Board asking for "further discussion" among members of the Board, to be followed by the Board voting on the matter. Although this statement by the chair was directed to members of the Board, Ribakoff approached the podium in the meeting room and asked for permission to speak a second time regarding item 10. The chair declined Ribakoff's request and asked Ribakoff to leave the podium and return to his seat. Counsel for the Board advised that Ribakoff had used all of the time allocated to him to address the Board on this agenda item, but that the Board could allow him additional time if it wished to do so. Although he was not granted additional time, Ribakoff insisted that he be allowed to speak. There followed a verbal exchange between him and the chair, with each talking over the other. Either at the beginning or during this exchange with the Board chair, Ribakoff moved from behind the podium and appeared to approach the dais. To Johnson, the chair became uncomfortable. Another Board member went to get a City of Long Beach police officer, who appeared and approached Ribakoff. The officer and Ribakoff had a conversation, which Johnson did not hear. Following that conversation, the officer and Ribakoff left the podium area.[1] Johnson recalled considering Ribakoff's actions to be disturbing because the rules for public speakers, which he violated, had been clearly stated.

---

[1]     After Johnson testified, a video containing the entirety and excerpts of the proceedings before the Board at its August 24, 2015 meeting was played for the court. The only record of what appeared on the video is in the "Statement of Tentative Decision," which is discussed, *post*, in footnote 27.

## II.     Ribakoff's Testimony

Ribakoff had been attending meetings of the Board for over two-and-a-half years as an interested citizen.  In his view, public transportation is "poor transportation for poor people" and there is considerable need to improve it.  During the years he has been attending meetings, all of the public speakers have respected the three-minute rule.  There has never been a meeting delayed by a disturbance created by a member of the public who speaks at a meeting.

Ribakoff signed up to speak at the August 24, 2015 Board meeting.  He had read the agenda for the meeting online prior to the meeting and decided to attend as, in his view, most members of the public in Long Beach did not have access to locations where TAP cards could be purchased.  His intent was to bring to the attention of the Board what he believed to be the difficulty in purchasing TAP cards.

He recalled the meeting that day lasted approximately two hours.  With respect to item 10, staff members and representatives of the Los Angeles County Metropolitan Transit Authority, who had been invited by the Board to do so, testified.  When it was time for public comment on item 10, Ribakoff spoke for three minutes, but had not finished what he wanted to say when his time expired.  He was the only speaker to criticize the program.  After he spoke and had returned to his seat, another speaker disagreed with his statement on lack of availability of TAP cards.  Ribakoff rose to speak a second time because he wanted to dispute the facts as presented by that speaker.  However, he was not permitted to speak; his microphone was cut off; and he was invited to speak with the Board's staff after the meeting.  When he got to his seat, he was approached by a police

5

officer who ordered him out of the room under threat of arrest. A few minutes later, he returned to the meeting; moments thereafter the Board voted on item 10.

At the conclusion of the meeting, Ribakoff left the meeting room and was approached by the same police officer, who told him that if he spoke out of turn again he would certainly be arrested. The officer cited Long Beach Municipal Code (LBMC) 2.03.140, also writing that code section on the back of one of his business cards which he handed to Ribakoff. Ribakoff has not returned to Board meetings since then because he does not want to be arrested on what he considers to be a "really vague and improper law."

He later attempted to meet with individual Board members, but was denied contact information for them. He sent a letter to the Board secretary for distribution to members. Following that, he met with one Board member who told him she had never received his letter. In his view, it is pointless to speak with staff.

In September 2015, Ribakoff spoke by telephone with the general counsel of the Board, who had been present at the August meeting, following up on that conversation with a letter in which Ribakoff made several requests, including that, as an "interim rule," "if there are no more than [two] public speakers, . . . each of them [would have] up to [five] minutes to speak." He also described the extant rule for public speakers as "unconstitutional."

The Board's general counsel responded by letter on September 22, 2015, advising Ribakoff that the Board's rules for public speakers were available online, would be printed on the card that persons wishing to speak would fill out when

6

requesting time to speak at a Board meeting, and were available with the Board agenda for its meetings; the general counsel also forwarded a copy of the revised speakers policy, entitled "Information and Procedures Concerning Conduct at Board of Directors' Meetings." The three-minute limit for each speaker was not changed.

On cross-examination, Ribakoff acknowledged he had filled out a speaker's card, containing the following notice: "Comments shall be limited to three (3) minutes for all comments, unless different time limits are set by the Chairperson, subject to the approval of the Board."

Ribakoff also acknowledged having spoken for three minutes on item 10. When he approached the podium later and asked to speak again, he acknowledged that his request was denied. In his view, the Board chair interrupted him; he was trying to speak but his microphone was cut off. Ribakoff acknowledged he had not filed a claim, either with the City of Long Beach or with the Board, prior to filing his lawsuit.

## III. Defense Case-in-chief

Amy Bodek is the Director of Development Services for the City of Long Beach. Her responsibilities include overseeing planning, building code enforcement, and administration. At the time of these events she was serving as one of the city's two representatives on the Board. Bodek was present at the meeting of the Board on August 24, 2015, which she described as lengthy. After the Board had had a discussion on item 10 and the chair called for a vote, Ribakoff, whom she recalled had spoken earlier for the length of time allocated to each speaker, attempted to speak again. As he did so, the Board chair "counsel[ed]" him that

he had already spoken for his allotted time. Ribakoff again attempted to speak and the chair told him that his opportunity had passed. Ribakoff continued to try to speak, and, when the chair attempted to speak, he interrupted her. At this point, Bodek got up from her seat and went to get a security guard. In the City of Long Beach there is a uniform rule that allows each speaker three minutes to speak on a matter at any public meeting.

On cross-examination, Bodek testified that staff members are not subject to the rule limiting speakers to three minutes. During the approximately two-and-a-half years she has been attending Board meetings, the number of members of the public who speak varies; within the last six months there was one meeting at which five people made public comments on an agenda item. There was a single occasion on which a speaker was disruptive in the sense of not complying with the time limits. In Bodek's opinion, a public speaker who is being argumentative during his or her time addressing the Board is not being disruptive. In her view, being disruptive includes attempting to speak beyond the allotted three minutes. At the August 2015 meeting there was a disruption of between five to six minutes that delayed the vote on an agenda item.

## PROCEDURAL HISTORY

On February 11, 2016, Ribakoff filed a civil complaint against the Board, the City of Long Beach, and others,[2] in which

---

[2] Ribakoff sued the City of Long Beach, the Long Beach Transit Company, the LBTC, the LBTC Board of Directors, and Does 1 to 20, inclusive. The City of Long Beach is the sole

he alleged violations of the Tom Bane Civil Rights Act (the Bane Act; Civ. Code, § 52.1) and the Ralph M. Brown Act (the Brown Act; Gov. Code, § 54950, et seq.), of his right to freedom of speech as guaranteed by the United States and California Constitutions (U.S. Const., 1st Amend., cl. 3; Cal. Const., art. I, § 2), and of a violation of  procedural requirements relating to the Brown Act contained in article I, section 3, subdivision (b)(7) of the California Constitution.  He also alleged that LBMC 2.03.140 is "overbroad[,] vague . . . not . . . reasonable[,] . . . not content neutral, and . . .  a prior restraint."[3]  He sought declaratory and

shareholder of the Long Beach Transit Company.  All defendants presented a common defense.

[3]     Although Ribakoff also alleged a violation of Civil Code section 52, that citation was inapt as section 52 is part of a different statutory plan, the Unruh Civil Rights Act (Civ. Code, § 51 et seq.), which proscribes specified conduct by business establishments.  (See *Stamps v. Superior Court* (2006) 136 Cal.App.4th 1441, 1450-1451 and accompanying footnotes.)  His claim for punitive damages under Civil Code section 52, subdivision (b)(1) was linked to this erroneous Unruh Civil Rights Act allegation.

Ribakoff alleged, but presented neither fact nor cogent argument to support, a violation of Government Code section 54953, subdivision (a), which requires that "[a]ll meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of [that body, with exceptions as provided]."  Nor is there any cogent discussion of this claim in his opening brief on appeal.  We therefore deem this claim waived.  (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6; *Tan v. California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811.)

9

injunctive relief, monetary relief in an unspecified amount, a civil penalty of $25,000, and attorney fees.

Ribakoff's complaint also alleged the Board had two "speech code rules" governing public meetings, each of which was enacted without public hearing or debate. He alleged the first such code, in effect at the time of the August 24, 2015 meeting, applied only to "public comment speakers" (as distinct from Board members, staff members, and invited guests, none of whom was subject to time limits in addressing the Board) and was strictly enforced: Speakers exceeding the three-minute limit were labeled disruptive, and expelled from the meeting "on pain of arrest under LBMC 2.03.140."

Ribakoff alleged the rules applicable to public comment speakers were changed, again allegedly without vote of the Board and "without findings demonstrating the interest protected by [these rules] and the need for protecting that interest." The newer speech code, which Ribakoff attached to his complaint, is headed "Information and Procedures Concerning Conduct at Board of Directors' Meetings." This speech code allows up to three minutes for each member of the public to speak on an agenda item. If adjustment is required based on the total time allotted for public comment and the number of speakers, Ribakoff alleged the time allotted to each speaker is reduced.[4] No time limit is stated in the code for staff members to address the Board. Ribakoff also alleged the new code allows the Board chair to

---

[4] This provision reads: "Three-minute time limit for each speaker unless the Board specifies a different time limit based on the time allotted for the item and the number of speakers."

"censor and even remove a member of the public . . . if [the chair] decides that you are 'rude, boisterous, or profane . . . .'"[5]

Ribakoff alleged each version of the speech code constitutes a "content based prior restraint."

Addressing his particular circumstances, Ribakoff alleged he was present at the September 29, 2015[6] meeting of the Board, spoke in opposition to item 10, and was not allowed to speak later in the meeting. Ribakoff also alleged no other speaker spoke in opposition and that several Board members spoke without time restriction, as did persons invited to the meeting by the Board and as did staff to the Board.

Ribakoff filed motions for preliminary injunction on March 9 and March 21, 2016. On April 1, the trial court continued these motions to April 21 and set the final status conference and trial dates. Following a hearing on the motions for preliminary injunction, the court took the matters under submission, denying them on April 26, 2016.

Defendants filed their answer on April 7, 2016, denying all allegations and asserting several affirmative defenses, including

---

[5] This provision of the September 2015 version of the code provides: "Persons demonstrating rude, boisterous or profane behavior will be called to order by the Chair. If such conduct continues, the Chair may call a recess, requesting the removal of such person(s) from the Council Chamber, adjourn the meeting or take some other appropriate action."

[6] This date is certainly a typographical error. Ribakoff testified that he had not attended any meetings of the Board since August 24, 2015. It is clear from Ribakoff's trial testimony and argument that the meeting he intended to reference took place on August 24, 2015.

11

that Ribakoff had failed to comply with the Government Tort Claims Act (Gov. Code, § 900 et seq.) prior to filing the lawsuit.[7]

At the conclusion of the trial on August 8, 2016, the trial judge made an oral announcement of his decision, filing a Statement of Tentative Decision on September 8, 2016. Ribakoff filed a request for clarification on September 22, 2016. The trial court entered its judgment on October 4, 2016. There is no indication in the record on appeal that the trial court specifically responded to Ribakoff's request.

On December 8, 2016, Ribakoff filed his timely notice of appeal.

## CONTENTIONS

Ribakoff raises several sets of contentions in his appeal. First, he raises three standing claims: (a) He has standing to challenge the "legality" of the Bane Act and of the Brown Act; (b) his standing to assert equitable claims under the Government Claims Act is not dependent upon first having filed a claim with the government agencies he later sued; and (c) he may challenge the Board's speech code revised in September 2015, which was never applied to him, as well as the earlier version of the speech code applied to him at the August 24, 2015 Board meeting.

Second, he contends the speech code and the events which occurred at the August 24, 2015 meeting of the Board violated his rights under the Bane Act and the Brown Act.

---

7    Defendants refer to the statute as the California Tort Claims Act; however, as explained in *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 741, the correct name for these statutes is the Government Claims Act.

12

Third, he contends the trial court erred in not finding that the two versions of the Board's speech code and LBMC 2.03.140 violate both Government Code section 54954.3, subdivision (b), and the First Amendment to the United States Constitution, facially and as applied.

Fourth, he contends the trial court violated article 1, section 3 of the California Constitution when it limited an "access right[]" (access by the public to public meetings) by adopting the September 2015 version of the speech code without having made "constitutionally mandated findings."[8]

---

[8] Ribakoff includes other claims in his opening brief, but does so either merely by citing a statute, or by making a declarative statement, in each circumstance without cogent argument. (E.g., his claims that the speech codes violate art. I, § 2(a) of the Cal. Const. and that there were violations of Civ. Code, §§ 47 and 52, and Gov. Code, § 54957.9.) Each of these claims is waived because Ribakoff has not met his burden as appellant to establish reversible error by cogent argument and appropriate citation to authority. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655-656; *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 556-557.)

Ribakoff also makes one evidentiary contention on appeal, that the trial court erred in rendering its judgment by relying in part on the video of the August 24, 2015 Board meeting without having admitted it into evidence. Ribakoff errs as, with his consent, the video was admitted into evidence on the first day of trial.

**DISCUSSION**

## I.    Standards for Review of Ribakoff's Claims

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo.  (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765 . . . .)  We apply a substantial evidence standard of review to the trial court's findings of fact.  (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364 . . . (*Foreman*).)  Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.  (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613 . . . (*Gevorgian*).)

"A single witness's testimony may constitute substantial evidence to support a finding.  (*Gevorgian, supra*, 218 Cal.App.4th at p. 613.)  It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility.  (*Foreman, supra*, 144 Cal.App.4th at p. 365.)  'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.'  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 . . . .)  Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.'  (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48 . . . .)"  (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

14

"[A]n appellant must do more than assert error and leave it to the appellate court to search the record and the law books to test his claim.  The appellant must present an adequate argument including citations to supporting authorities and to relevant portions of the record." (*Yield Dynamics, Inc. v. TEA System Corp.*, *supra*, 154 Cal.App.4th at p. 557.)  Even when error is demonstrated, the judgment will not be reversed unless it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see Cal. Const., art. VI, § 13.)

"'A trial court rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate rather than evidentiary facts.  A trial court is not required to make findings with regard to detailed evidentiary facts or to make minute findings as to individual items of evidence.  Only where a trial court fails to make findings as to a material issue which would fairly disclose the determination by the trial court would reversible error result.  Even though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings.  A failure to find on an immaterial issue is not error. [Citation.]  In issuing a statement of decision, the trial court need not address each question listed in a party's request.  All that is required is an explanation of the factual and legal basis for the court's decision regarding such principal controverted issues at trial as are listed in the request.  [Citation.]' (*Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518,

1525 . . . ; [see] *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 524-525 . . . ; 7 Witkin, Cal. Procedure [(4th ed. 1997)] Trial, § 411.)" (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 67-68.)

When constitutional provisions and statutes are at issue, we independently review their meaning. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432; *Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74; *Plunkett v. Spaulding* (1997) 52 Cal.App.4th 114, 126.) We also review de novo the application of a constitutional provision or statute to undisputed facts. (*Lozada v. City and County of San Francisco* (2006) 145 Cal.App.4th 1139, 1149; *Pettus v. Cole* (1996) 49 Cal.App.4th 402, 405-406.) De novo review applies in particular to cases raising First Amendment concerns, i.e., we independently decide whether the action, statute or ordinance violates the First Amendment to the United States Constitution. (*In re George T.* (2004) 33 Cal.4th 620, 631; *McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 842; *Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1082; accord, *Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 499-511 [104 S.Ct. 1949, 80 L.Ed.2d 502].)

## II.    The Government Claims Act

The Government Claims Act requires that prior to filing suit to recover monetary damages from a governmental entity, a prospective plaintiff must file a proper claim with that entity and allow it time to consider its merits (with exceptions not relevant to the present case). Claims that do not seek "money or damages" and those in which the "primary purpose" is for declaratory or injunctive relief are not subject to this pre-litigation filing

16

requirement.  (Gov. Code, §§ 905, 905.2; *Loehr v. Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1079.)

Ribakoff did not file a claim of any type with any defendant before filing his complaint, which included prayers for monetary damages as well as for equitable (declaratory and injunctive) relief.  Defendants asserted non-compliance with the Government Claims Act as the first affirmative defense in their answer.  On the first day of trial, when the issue of Ribakoff's failure to file a claim prior to filing his lawsuit was addressed, Ribakoff offered to dismiss his claims for monetary relief, conceding that those claims were barred by the Government Claims Act.[9]  No ruling on that offer appears in the record.

At the close of Ribakoff's case in chief, the defense made a motion for judgment under Code of Civil Procedure section 631.8.[10]  The trial judge granted defendants' motion in part,

---

[9]     Although Ribakoff offered to waive all claims for money damages prior to beginning trial as noted in the text and his opening brief on appeal acknowledges that waiver, he nevertheless contends he may continue to seek "the statutory penalty."  There is some authority suggesting that a civil penalty of $25,000 is recoverable for violations of the Bane Act (see CACI No. 3066 Directions for Use), but no appellate case decided by a California court has so held. As Ribakoff's unilateral waiver in the trial court was unconditional, his attempt to reclaim his request for the statutory penalty would be unavailing were he to prevail in this appeal.

[10]    A motion under Code of Civil Procedure section 631.8 may be made in a non-jury trial by a party after the opposing party completes the presentation of its case in chief.  The judge, sitting as trier of fact, may weigh the evidence and order judgment in favor of the moving party.  (*Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1327.)

17

dismissing Ribakoff's claims for monetary damages because he had not complied with the Government Claims Act. The trial continued, concluding with judgment for the defense on all causes of action.

Anticipating an argument by defendant in this appeal, Ribakoff contends he was not required to comply with the Government Claims Act to proceed on his non-monetary claims under the Bane Act because, in seeking relief under that statute, his "primary purpose was equitable."[11]

In their appellate brief, defendants overlook both that the trial court granted their motion under Code of Civil Procedure section 631.8 only in part, and that Ribakoff had represented earlier in trial proceedings that his primary purpose in bringing a claim under the Bane Act (as well as with respect to his other claims for relief) was equitable.

In order to make its ruling, the trial court necessarily accepted Ribakoff's representation of his stated purposes. And, as Ribakoff points out, the case upon which defendants rely on appeal, *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, supports Ribakoff's position. Thus, in *Gatto*, the Court of Appeal reasoned that Gatto's claims (under the Unruh Civil Rights Act) were principally monetary in nature and therefore subject to the pre-filing requirements of the Government Claims Act.[12] (*Gatto*,

_____

[11] Ribakoff correctly points out that there is no Government Claims Act pre-filing requirement with respect to his cause of action under the Brown Act as that act does not provide for monetary relief, but "only provides equitable remedies."

[12] In *Gatto*, the Court of Appeal discusses the relationship between the Unruh Civil Rights Act and the Bane Act. We need only be concerned in the present case with that court's holding

18

*supra*, at p. 760.) The converse of that holding, that when the principal purpose is *not* monetary (and, also when no monetary relief is sought) is also correct, i.e., under those circumstances, the filing of a claim is not a condition precedent to filing suit against a governmental agency. (Gov. Code, §§ 905 ["all claims for *money or damages* against local public entities" (italics added)], 911.2 [claims, subject to exceptions not relevant here, first must be presented within a specified time limit (six months or a year of accrual, depending on the nature of the claim)], § 945.4 ["no suit for *money or damages* may be brought against a public entity on a cause of action for which a claim is required to be presented" (italics added)]; *State of California v. Superior Court* (2004) 32 Cal.4th 1234, 1239 [failure to comply with these conditions precedent bars filing a lawsuit against the governmental entity]; *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 454; *Canova v. Trustees of Imperial Irrigation Dist. Employee Pension Plan* (2007) 150 Cal.App.4th 1487, 1493.)

Defendants' argument that the trial court determined that Ribakoff's Bane Act claims were barred *in their entirety* because the principal purpose was a monetary recovery ignores both Ribakoff's concession in the trial court and the trial court's ruling on defendants' Code of Civil Procedure section 631.8 motion.

### III. The Bane Act

Ribakoff contends he established a violation of the Bane Act based on the police officer's statements to him both inside the

---

that compliance with the Government Claims Act is required "where the plaintiff *does* seek to recover damages from a public entity *and that is his or her chief purpose.*" (*Gatto v. County of Sonoma, supra*, 98 Cal.App.4th at p. 761.)

meeting room and outside following the conclusion of the August 24, 2015 Board meeting.

There is no evidence of the officer's statements to Ribakoff prior to Ribakoff temporarily absenting himself from the August 24, 2015 meeting. With respect to the declaratory statement made by the officer to Ribakoff outside the meeting room following the conclusion of the Board's meeting, that Ribakoff would be arrested if Ribakoff violated the Board's public speaker time limit at a future meeting, we find such a statement insufficient to meet the proscription of the Bane Act.[13]

Civil Code section 52.1, "commonly referred to as the 'Tom Bane Act' or as the 'Bane Act,' was enacted in 1987 as part of a renewed effort to combat the disturbing rise in 'hate crimes,' or, put otherwise, the rising incidence of civil rights violations motivated by hatred and discrimination." (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 845.)

The Bane Act provides in relevant part:

"(a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with

---

[13] In his opening brief, Ribakoff discusses the doctrine of standing to bring a claim under the Bane Act, apparently under the impression the trial court denied his claim of standing to do so. We find no such ruling by the trial court in the record. And, as is clear from Civil Code section 52.1, subdivision (b), quoted in the text of this opinion following this footnote, the Bane Act conveys standing to individuals to sue for violations of that act. (See *Bay Area Rapid Transit Dist. v. Superior Court* (1995) 38 Cal.App.4th 141, 144 [Bane Act provides standing to individuals to assert cause of action for interference based on the conduct described in Civ. Code, § 52.1].)

the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, [specified law enforcement officials] may bring a civil action for injunctive and other appropriate equitable relief [and monetary damages] . . . .

"(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, . . . injunctive relief, and other appropriate equitable relief . . . ." (Civ. Code, § 52.1, subds. (a), (b).)

From its inception, the purpose of the Bane Act has been to target unlawful conduct motivated by discriminatory animus that interferes with the victim's enjoyment of statutory or constitutional civil rights. (*Venegas v. County of Los Angeles*, *supra*, 32 Cal.4th at p. 846.)

Ribakoff argues he should have prevailed on his Bane Act claim based on the circumstances that "he was threatened with arrest." We review the facts in evidence based on the substantial evidence standard, discussed, *ante*.

The facts concerning this matter consist of Ribakoff's testimony, a declaration by the general counsel for the Board, the video of the relevant portions of the meeting and the business card of the police officer on which he wrote the citation to a section of the LBMC. Ribakoff testified he was ordered to leave the meeting room by the officer, admittedly because he had gotten into a verbal contest with the chair of the Board when she reminded him he had already spoken for three minutes and was

21

now interrupting the deliberations of and voting by the Board, followed by two contacts with the police officer.

There is no testimony as to why, if an order to leave the meeting room was given, Ribakoff returned to it before agenda item 10 was voted on. The trial court may well have discounted any inference to be drawn from the circumstance that Ribakoff had left the room based on the fact that he returned prior to the conclusion of the meeting without any untoward result.

It was in Ribakoff's second contact with the officer, after the meeting had concluded and outside the meeting room, that Ribakoff testified the officer warned him he would be arrested if he violated the Board's speech rules at a future meeting.

In finding no violation of the Bane Act, the trial court necessarily concluded that these facts were insufficient to meet Ribakoff's burden. We agree there is no substantial evidence to support a violation of the Bane Act. Factually, the "threat" made was that *if Ribakoff violated the rules* applicable to public speakers at Board meetings, he could expect to be arrested. Thus, the statement was expressly conditioned on Ribakoff violating a rule for public speakers of which Ribakoff was well aware from his prior attendance at meetings and his completing the speaker's card on which the rule is written.

With respect to Ribakoff's argument that this warning has deterred him from attending any other meetings of the Board, Ribakoff omits the fact that he received a letter from the Board's general counsel on or shortly after September 22, 2015, in which the lawyer invited him to return to meetings. The lawyer for the Board wrote: "You are welcome to attend the Board . . . meetings and are invited to participate in matters before [it], subject to the attached Information and Procedures Concerning Conduct at

Board . . . [m]eetings. Thank you for your interest and commitment to public transportation."

With these facts as a basis, the interaction between the officer and Ribakoff does not support a determination that there was a violation of this statute. The Bane Act proscribes conduct that interferes, *by threats, intimidation or coercion*, with the exercise or enjoyment by an individual of rights secured by the federal or state constitutions. The statement by the officer was a statement that *if Ribakoff violated the law*—if he demanded to speak in violation of the speakers' time limits—he would be subject to arrest. That is not, without more, an intimidating statement or a threat. Nor, as discussed, *post*, does it impinge on a right secured by either the federal or state constitutions.

Ribakoff's argument on appeal is essentially that *because Ribakoff disagrees with* the Board's rule limiting members of the public to three minutes in addressing the Board on any agenda item, *he feels intimidated* and will not return to a meeting because he will be subject to arrest. What Ribakoff is actually arguing is that he should not be bound by the Board's rules limiting public speakers to three minutes on any agenda item. Thus, his objection is to the time limit rule rather than to the officer's statement to him. And, it is Ribakoff's own disregard for this time limit and his subjective feeling that create his fear—not the officer's warning of the consequences if he does so.

Ribakoff is construing the officer's statement that Ribakoff may expect to be arrested *if he violates the law* without considering the condition precedent to any arrest: that Ribakoff violate the Board's speech rule. The officer did not "threaten" Ribakoff with violence, but with arrest if he violated the law. Ribakoff's contention is based on a misinterpretation of the

23

officer's words—which are conditional—and ignores the essential requirement of proof to prevail on a claim under the Bane Act: here, that what the officer said constituted a threat to commit a violent act.

Thus, both the statute, quoted, *ante*, and the cases we now discuss, require that to prevail on a cause of action under the Bane Act, a plaintiff must show that the defendant interfered with or attempted to interfere with the plaintiff's legal right *by threatening or committing violent acts*. (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 881-882; see generally *Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 334.) Establishing a violation of the Bane Act requires more than a statement such as that made by the officer. There must be an evidentiary showing of threatening conduct independent of the alleged interference or violation of a civil right. (*Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947, 959; see *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 67 ["There are two distinct elements for a [Civ. Code, §] 52.1 cause of action. A plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion"], citing *Jones v. Kmart Corp.*, *supra*, at p. 334.)

In *Doe v. State of California* (2017) 8 Cal.App.5th 832, the court stated, "Here, assuming agents of the [defendant] threatened to arrest/prosecute [the plaintiff] if he failed to register as a sex offender, the [plaintiffs] did not allege those agents engaged in independently threatening (or intimidating, coercive) conduct apart from the threats to arrest/prosecute him. Moreover, the evidence shows that [the plaintiff] could have

24

determined his legal duties regarding registration as a sex offender; State agents did nothing to prevent him from exercising his legal rights.  Under the circumstances, the [defendant's] sharing of [the plaintiff's] information with local law enforcement does not constitute "'threat, intimidation, or coercion'" for purposes of Civil Code section 52.1.  [Citation.]  Accordingly, the [plaintiffs] have not established a probability of prevailing on their Bane Act claims.  (*Id.* at p. 843.)

"'Speech alone is not sufficient to support an action brought pursuant to subdivision (a) or (b) [of Civil Code section 52.1], except upon a showing that the speech itself *threatens violence . . .* and that the person *threatening violence* had the apparent ability to carry out the threat.'"  (*Shoyoye v. County of Los Angeles*, *supra*, 203 Cal.App.4th at pp. 958-959.)

Here, nothing the officer said to Ribakoff meets the test of this statute.  The trial court correctly concluded there was no violation of the Bane Act.

## IV.    The Brown Act and First Amendment Claims

Ribakoff contends, because the Board's speech rules apply only to members of the public and limit any speech by a member of the public to a specified time for any particular agenda item, each such rule is a content based rule proscribed by the Brown Act and by the free speech clause of the First Amendment to the United States Constitution.

Because Ribakoff interweaves his arguments under the Brown Act with his free speech claims, and with a claim that LBMC 2.03.140 is also flawed, we address these claims together.

25

A.    *Relevant Facts*

The only evidence in the record of the speech code applicable at the August 24, 2015 meeting of the Board at which Ribakoff spoke was set out on the card which each speaker completed prior to speaking.  The card states this rule as follows: "Comments shall be limited to three (3) minutes for all comments, unless different time limits are set by the Chairperson, subject to the approval of the Board."  When Ribakoff attempted to speak a second time on item 10, the record indicates the chair reminded him he had already used the three minutes allowed to him under the rule.  The general counsel for the Board then advised the chair the Board had the power to allow him additional time.  No additional time was granted; Ribakoff and the chair spoke over each other; the microphone at the speaker's location was shut off; a police officer arrived and spoke to Ribakoff, who then left the podium and, later, the meeting room, returning prior to the conclusion of the meeting.

The record does contain the revised speakers rule, put in place in September 2015.  The September 2015 iteration of this rule contains a statement of the time limitation on public speakers almost identical to that applied at the August 24, 2015 meeting.

B.    *Standing*

Ribakoff contends the trial court ruled he did not have standing to bring this cause of action, and in so ruling, erred. While, during trial, the court did comment on the issue of Ribakoff's standing under the Brown Act, it appears from both the Statement of Tentative Decision and the Judgment the court entered that the court ultimately determined that Ribakoff did

26

have standing.  We nevertheless briefly discuss Ribakoff's argument with respect to the Brown Act before addressing his more problematic claim of standing to assert his constitution-based claims.

1.     Brown Act Standing

Ribakoff's standing to assert a claim under the Brown Act is clear.  Thus, the Brown Act "is intended to ensure the public's right to attend the meetings of public agencies[,] . . . to facilitate public participation in all phases of local government decisionmaking and to curb misuse of the democratic process by secret legislation of public bodies."  (*International Longshoremen's & Warehousemen's Union v. Los Angeles Export Terminal, Inc.* (1999) 69 Cal.App.4th 287, 293.)

Implementing its purposes, the Brown Act contains a broad authorization for citizen standing.  Government Code section 54960, subdivision (a) provides:  "The district attorney or any interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of stopping or preventing violations or threatened violations of [the Brown Act] by members of the legislative body of a local agency or to determine the applicability of [the Brown Act] . . . to past actions of the legislative body, subject to Section 54960.2 . . . ."[14]  The

---

[14]     The phrase "legislative body of a local agency" is broadly construed to include "[t]he governing body of a local agency or any other local body created by state or federal statute."  (Gov. Code, § 54952, subd. (a).)  It also includes "A commission, committee, board, or other body of a local agency . . . created by . . . formal action of a legislative body."  (*Id.*, subd. (b).)  Defendants are such entities.

27

breadth of this legislative statement of standing is illustrated in *McKee v. Orange Unified School Dist.* (2003) 110 Cal.App.4th 1310 (*McKee*), in which that appellate court upheld the standing of a plaintiff who was neither a resident nor a taxpayer in Orange County to obtain an injunction to require the defendant local school district to comply with multiple provisions of the Brown Act. It was sufficient that he be a taxpayer/citizen of the State of California. (*Id*. at pp. 1314-1316.)[15] We conclude Ribakoff has standing in this case to assert his Brown Act claims.

> 2. Standing to Assert Constitutional Claims—
> Facial Challenge

With respect to Ribakoff's contentions that the speech rules of the Board violate his First Amendment rights, both on their

---

[15] *McKee* was decided under a prior version of Government Code section 54960. In 2012 the Legislature added section 54960.2 and inserted a reference to this new statute in section 54960 of the Government Code. (Stats 2012, ch. 732, §§ 1, 2.) The new statute made the right to sue for a violation of the Brown Act contingent upon the prospective plaintiff first submitting a cease and desist letter to "the legislative body being accused of the violation." (Gov. Code, § 54960.2, subd. (a)(1).) If that body did not take formal action as required by the statute within a specified period of time, the individual may file suit. (Gov. Code, § 54960.2, subd. (c).) In this case, Ribakoff provided notice to the Board substantially complying with this statute prior to filing suit. Thus, Ribakoff had standing to bring this litigation. (See *Center for Local Government Accountability v. City of San Diego* (2016) 247 Cal.App.4th 1146, 1156 [compliance with Gov. Code, § 54960.2 is required prior to filing suit alleging violation of Gov. Code, § 54960 with respect to a "past action" of a legislative body].)

face and as applied, different considerations must be evaluated. A challenge to a statute, ordinance, or rule, may be either facial or as applied. A facial challenge considers only the text of the measure itself, not its application to the particular circumstances encountered by the individual. (*Dillon v. Municipal Court* (1971) 4 Cal.3d 860, 865.) The party challenging the measure must demonstrate that its "'provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.'" (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 267, quoting *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 181.) The party challenging the measure cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute. (*Arcadia*, *supra*, at p. 267, quoting *Pacific Legal Foundation*, *supra*, at p. 180.)

Only a statute that is substantially overbroad may be invalidated on its face. (City of *Houston, Texas v. Hill* (1987) 482 U.S. 451, 457 [107 S.Ct. 2502, 96 L.Ed.2d 398]; see *Williams v. Garcetti* (1993) 5 Cal.4th 561, 578.) The burden to establish the validity of such a challenge is on the plaintiff. Further, "'[a]pplication of the overbreadth doctrine . . . is, manifestly, strong medicine. It has been employed . . . sparingly and only as a last resort.'" (*Williams*, *supra*, at p. 577, citing *Broadrick v. Oklahoma* (1973) 413 U.S. 601, 613 [93 S.Ct. 2908, 37 L.Ed.2d 830]; accord, *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 814 [all presumptions and intendments favor the validity of statutes, and they will be upheld unless their unconstitutionality clearly and unmistakably appears].) To support a determination of facial unconstitutionality, voiding the provision in its entirety, the proponent must establish that the provisions challenged

29

"""inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.""" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.)

The same principles apply to the Board's speech code and ordinances as apply to statutes. (See *Sturgeon v. Bratton* (2009) 174 Cal.App.4th 1407, 1419.)

"'In interpreting [the provision being challenged], we apply the usual rules of statutory construction: "We begin with the fundamental rule that our primary task is to determine the lawmakers' intent. [Citation.] . . . To determine intent, '"The court turns first to the words themselves for the answer."' [Citations.] 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . ."' [Citation.] We give the language of the statute its "usual, ordinary import and accord significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided."' (*Kane v. Hurley* (1994) 30 Cal.App.4th 859, 862 . . . .)" (*Sturgeon v. Bratton* (2009) 174 Cal.Apop.4th 1407, 1420-1421.)

### 3. Standing—As Applied Challenge

"An as applied challenge may seek (1) relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied, or (2) an injunction against future application of the statute or ordinance in the allegedly impermissible manner it is shown to have been applied in the past. [Such a challenge]

contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right. (See, e.g., *Broadrick v. Oklahoma* [, *supra*,] 413 U.S. [at pp.] 615-616 . . . ; *County of Nevada v. MacMillen* (1974) 11 Cal.3d 662, 672 . . . ; *In re Marriage of Siller* (1986) 187 Cal.App.3d 36, 49 . . . .)" (*Tobe v. City of Santa Ana, supra*, 9 Cal.4th at p. 1084.) To prevail on such a contention, the party asserting an as applied challenge must establish a pattern of impermissible application of the statute, rule or policy. (*Id.* at p. 1085.)

C.    *Analysis of Substantive Claims*[16]
1.    Contentions Based on Interrelating the Brown Act, the Speech Codes and the LBMC

Ribakoff argues that neither LBMC 2.03.140, nor the Board's "criminal speech rules" are authorized by the Brown Act.

Ribakoff errs. First, Ribakoff mistakenly bases his argument on the assertion that the LBMC ordinance was *authorized by* the Brown Act. Thus, Ribakoff asserts "The Brown

_____

[16]    We reject Ribakoff's claim that the September 2015 version of the speech code is invalid as applied to him as, by his own admission, it has never been so applied. Nor is there any evidence that it has been applied to any other person who has attended a meeting of the Board following announcement of the new speech code.

31

Act does not authorize either the city ordinance or any of [the LBTC's] criminal speech rules."[17]

Ribakoff misperceives the relationship between the Brown Act and the ordinance. Ribakoff's argument that the ordinance must be authorized by the Brown Act evidences a misunderstanding of the fact that the City of Long Beach is a charter city and therefore has plenary power over its municipal affairs, including the police power to adopt ordinances such as LBMC 2.03.140, so long as its actions are not preempted by state or federal law. (Cal. Const., art. XI, §§ 5, 7; see *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 12-13.)

Second, the Brown Act expressly permits legislative bodies of local agencies to adopt reasonable time limitations on public testimony. (Gov. Code, § 54954.3, subd. (b)(1).)

Third, neither version of the speech code contains any criminal sanction.

---

[17] Ribakoff also claims the two speech codes were "never adopted" by the Board and are invalid for that reason as well. However, while the burden is his, as plaintiff below, to establish this "fact," he makes no reference in his appellate brief to any evidence which he introduced at trial to substantiate this claim. Indeed, there is no evidence that Ribakoff availed himself of Evidence Code section 1284 (proof of absence of official record), which would have allowed him to obtain admissible evidence of the absence of any record of adoption of one or both speech codes, if no record of adoption did exist. For this reason, he has waived the claim of lack of formal adoption of either version of the speech code. (See fn. 3, *ante.*)

32

### 2. LBMC 2.03.140 and the First Amendment

Ribakoff contends LBMC 2.03.140 is unconstitutional, both on its face and as applied to him.  He bases this claim on his reading of *In re Kay* (1970) 1 Cal.3d 930 (*Kay*), arguing that LBMC 2.03.140 is unconstitutional for the same reason that Penal Code section 403 was determined to be unconstitutional in *Kay*.[18]  Ribakoff misunderstands the holding of *Kay*.

Ribakoff is correct that the Long Beach ordinance is "all but identical" to the statute at issue in *Kay*.  LBMC 2.03.140 provides:  "No person without authority of law shall disturb, interrupt, or break up any meeting or session of the Council, or of any legally constituted board or commission of the City."[19]

Penal Code section 403 provides: "Every person who, without authority of law, willfully disturbs or breaks up any assembly or meeting that is not unlawful in its character . . . is guilty of a misdemeanor."

In *Kay*, our Supreme Court was asked to consider the First Amendment implications of Penal Code section 403, which had been the basis for the arrest of several persons who had made a disturbance during an Independence Day speech to a public gathering of approximately 6,000 persons in a park in the farming community of Coachella by a candidate for reelection to

---

[18]  Ribakoff also claims this ordinance is unconstitutionally "vague" as applied.  While Ribakoff has standing to raise this claim even though he was not arrested (see *Prigmore v. City of Redding* (2012) 211 Cal.App.4th 1322, 1349), the holding of *Kay*, which we discuss in the text, *post*, establishes this claim is without merit.

[19]  Ribakoff has not cited any provision of the LBMC which makes violation of this ordinance a misdemeanor.

the United States House of Representatives.  The protesters had "engaged in rhythmical clapping and some shouting" during the speech, but without interfering with the speaker completing his speech; he did, "paus[e] to assure those protesting that they had a right to do so . . . .  At no time did either the speaker or the police ask the protestors to be silent or to leave."  Charges were filed two weeks later.  (*In re Kay*, *supra*, 1 Cal.3d at p. 936.)  The protesters were later convicted of violating this Penal Code provision.

In its opinion granting the petitioners in *Kay* a writ of habeas corpus on the ground that petitioners had not unreasonably interfered with a public meeting, our Supreme Court construed Penal Code section 403 to eliminate doubt as to its constitutionality, holding that Penal Code section 403 "authorizes the imposition of criminal sanctions only when the defendant's activity itself—and *not* the content of the activity's expression—substantially impairs the effective conduct of a meeting."  (*In re Kay*, *supra*, 1 Cal.3d at p. 942.)

The court explained, "the nature of a meeting necessarily plays a major role.  [Citation.]  The customs and usages at political conventions may countenance prolonged, raucous, boisterous demonstrations as an accepted element of the meeting process; similar behavior would violate the customs and usages of a church service.  Audience participation may be enthusiastically welcomed at a bonfire football rally or an athletic contest, but considered taboo at a solemn ceremony of a fraternal order.  Explicit rules governing the time and place of permitted nonviolent expressions [citations] may in some circumstances fix the limits of permissible conduct.  Violation of such customs or rules by one who knew or as a reasonable man should have

34

known of them would justify the application of [Penal Code] section 403. Thus, rather than enacting monolithic standards, [Penal Code] section 403 draws its content from the implicit customs and usages or explicit rules germane to a given meeting." (*In re* Kay, *supra*, 1 Cal.3d at p. 943, fn. omitted.)

As noted, LBMC 2.03.140 is substantially similar to Penal Code Section 403; accordingly, it should be construed in like manner. Thus, Ribakoff's claim that LBMC 2.03.140 must be voided because the similar Penal Code section had been invalidated rests on an invalid premise.[20] Just as our Supreme Court *upheld* the constitutionality of Penal Code section 403, as construed, we conclude that LBMC 2.03.140 is not unconstitutional when similarly construed. *Kay* does make a distinction which we will address, *post*, with respect to other contentions of Ribakoff, i.e., analysis of rights under the First

---

[20] To support his argument, Ribakoff also mistakenly relies on a quotation from the syllabus preceding the United States Supreme Court's opinion in *Madison Sch. Dist. v. Wisconsin Emp. Rel. Comm'n* (1976) 429 U.S. 167 [97 S.Ct. 421, 50 L.Ed.2d 376] (*Madison*). In that case, the United States Supreme Court held that a public body (there, a school board) sitting in a public meeting to conduct public business cannot permit some public speakers but exclude others on either the basis of their employment or the content of their speech. (*Id*. at p. 176.) That factual circumstance is inapposite to the situation in the present case. Nothing in that court's determination that such a restriction was invalid suggests application to the present case.

In addition, Ribakoff's use of a quotation from the syllabus preceding the opinion is inappropriate. Immediately preceding the syllabus there is a footnote notice that the syllabus "constitutes no part of the opinion of the court." (*Madison, supra*, 429 U.S. 167.)

Amendment differs depending on the nature of the forum in which the views are sought to be expressed.

### 3. Constitutional Claims Based on Restrictions on Time Allowed for Public Speakers

Ribakoff contends the time limits imposed by the speech rules of the Board violate his First Amendment rights; he also contends the circumstance that no time limits are imposed on staff and invited guests support his claim. And, he alleges that these speech rules are unconstitutional both on their face and as applied.

Government Code section 54954.3, subdivision (a) provides: "Every agenda for regular meetings shall provide an opportunity for members of the public to directly address the legislative body on any item of interest to the public, before or during the legislative body's consideration of the item . . . ." Subdivision (b)(1) of the same section provides: "The legislative body of a local agency may adopt reasonable regulations to ensure that the intent of subdivision (a) is carried out, including, but not limited to, regulations limiting the total amount of time allocated for public testimony on particular issues and for each individual speaker." And subdivision (c) of the same section provides: "The legislative body of a local agency shall not prohibit public criticism of the policies, procedures, programs, or services of the agency, or of the acts or omissions of the legislative body. Nothing in this subdivision shall confer any privilege or protection for expression beyond that otherwise provided by law."

Ribakoff cites this statute in support of his contention that the Brown Act does not authorize the speech limits which the Board applied. Based on this statute, he argues the Board's

36

speech rules are not reasonable because "they exist [for some reason other than] to allocate the limited time among the crush of public speaker[s] at the bus company's board meeting[s]."[21] He also argues, "A law [apparently referring to the speech rules] that prohibits you from 'disturbing' a council meeting is a law that prohibits you from disturbing it by criticizing it." Thus, Ribakoff's claim is that the rules at issue exist to prevent speakers from expressing views that the Board does not want to hear, and this limitation impinges on Ribakoff's right to speak in a public forum.

> a. *Time limitation on Ribakoff's statements to the Board.*

Ribakoff's claim that the speech rules exist to censor comments is without factual basis. When Ribakoff spoke the first time on item 10, there is no evidence he was interrupted in expressing his opposition to the new TAP card policy which the Board was then considering adopting. Nor is there any other evidence his criticism of item 10 was interrupted or that the content of his remarks was being censored. Instead, it was only when he rose to speak a second time—during the period for discussion, deliberation and voting by members of the Board— that his request to speak again was turned down.

Nor is there any evidence his request for additional time was rejected based on the content of what he was going to say.

---

21      Based on the overarching theme of his opening brief, it appears Ribakoff is arguing the regulations are implemented to prevent speakers from expressing views that the Board does not want to hear. For reasons we discuss in the body of this opinion, we find this argument to be factually and legally incorrect.

(Additionally, there is no evidence of what he had intended to say if he had been allowed to speak a second time, other than what he offers on appeal—that he was going to dispute what another speaker (likely a staff member or one of the MTA representatives who had made a presentation to the Board) had said during the public hearing on the agenda item.)  Instead, the facts establish Ribakoff's second request to speak was declined because previously he had consumed all of the time allowed to him as a member of the public to speak on a particular agenda item.

     b. *Limitation on public testimony as opposed to staff testimony.*

  Ribakoff also argues the limitation on public testimony is unreasonable because staff members and guests invited to speak on particular agenda items are not so limited.  The essence of Ribakoff's argument is that a three-minute limit is presumptively unreasonable, particularly when there is no similar time limit on presentations by staff or invited guests.

  Ribakoff's argument fails to recognize the different purposes served by staff/invited guests, on the one hand, and members of the public, on the other.  The purpose of  staff/invited guest presentations to the Board, or any similar body, is to present to the members of that body in their capacity as legislators, and to the public in attendance, what can be detailed—and perhaps lengthy—analyses of the particular agenda item, to inform both the members of the board and the public concerning the item.  Limiting presentations by staff and guests who are invited to speak based on their expertise to the same extent as members of the public ignores the information function served by staff and invited experts.  Truncating such

38

presentations does not promote informed decision making by the legislative body. The chair of the legislative body continues to have the ability to regulate the length of those presentations. Nor is there any reason to think time allocated for those presentations would be unlimited or extend beyond that needed to inform all in attendance concerning the particular agenda item.

On the other hand, having no limit on either the length of any particular presentation by a member of the public or on the number of public speakers (or on the total time for public comment) has the potential for endless discussion—given the potential that there will be a far greater number of members of the public who may wish to speak to an issue than there are staff and guests who make presentations concerning it. The number of staff and invited guests speaking on a topic will clearly be limited; the potential for public speakers is potentially extensive and needs some reasonable limitation.

We do not suggest that members of the public may not have expertise, or that their presentations would be of lesser value than those of the invited, expert staff and guest speakers, only that their number must be considered in weighing the time allotted to public participation. Indeed, this concern was a factor in shaping the text of Government Code section 54954.3 as it moved through the Legislature with amendments to the Brown Act adopted in 1986. On the one hand, the Legislature declared the importance of open governance and the public's right to participate.[22] On the other, it validated enactment of limits on

---

[22]    Thus, Government Code section 54950 provides in part: "In enacting [the Brown Act], the Legislature finds and declares that the public commissions, boards and councils and the other public

public speakers so that the business of government could function.  (Gov. Code, § 54954.3.)[23]

 

                         c.  *Public forum verses limited public forum.*

Ribakoff seeks to apply First Amendment principles applicable to public fora to *limited* public fora, such as meetings of the Board.  In making this claim, Ribakoff does not appreciate that the First Amendment does not apply in the same way in the two fora.

The case upon which Ribakoff places principal reliance for his claim that the speech codes violate the Brown Act discusses this difference.  *White v. City of Norwalk* (9th Cir. 1990) 900 F.2d 1421 (*White*) was an action brought by two plaintiffs who were ruled out of order when they spoke or attempted to speak at a

---

agencies in this State exist to aid in the conduct of the people's business.  It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly."

[23]     The 1986 Legislature enacted significant amendments to the Brown Act, set out in Statutes 1986, chapter 641.  In the course of its enactment of these changes, the Senate Local Government Committee Report on Assembly Bill No. 2674 notes, "The Committee may wish to consider whether the requirement for public comment will unnecessarily slow down local agencies' meetings.  The Committee may also wish to consider whether the bill gives local officials sufficient control over public comment periods without stifling their intent."  (Sen. Local Government Com., Rep. on Assem. Bill No. 2674 (1985-1986 Reg. Sess.) May 22, 1986, p. 3.)  The text of Government Code section 54954.3 was then modified to read as it exists at present.  We take judicial notice of this legislative history.  (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26 [collecting cases].)

meeting of the city council of the City of Norwalk.  They sued under the federal civil rights statutes (42 U.S.C. § 1983), seeking to vindicate their First Amendment and other civil rights claims by having the court issue a declaration that a specific provision of the Norwalk City Code (former § 2-1.2, now § 2.08.020 (Ord. 1470, § 2, 1997))[24] was unconstitutional; an injunction against

---

[24]     The cited ordinance provided:

"[B]  Rules of Decorum.  While any meeting of the City Council is in session, the following rules of order and decorum shall be observed:  [¶] . . . [¶]

"3. Persons Addressing the Council.  . . . Each person who addresses the Council shall do so in an orderly manner and shall not make personal, impertinent, slanderous or profane remarks to any member of the Council, staff or general public. Any person who makes such remarks, or who utters loud, threatening, personal or abusive language, or engages in any other disorderly conduct which disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting shall, at the discretion of the presiding officer or a majority of the Council, be barred from further audience before the Council during that meeting.  [¶]  . . . [¶]

"[D]  Enforcement of Decorum.  The rules of decorum set forth above shall be enforced in the following manner:

"1. Warning. The presiding officer shall request that a person who is breaching the rules of decorum be orderly and silent. If, after receiving a warning from the presiding officer, a person persists in disturbing the meeting, the presiding officer shall order him or her, to leave the Council meeting. If such person does not remove himself or herself, the presiding officer may order any law enforcement officer who is on duty at the meeting as sergeant-at-arms of the Council to remove that person from the Council chambers.  [¶]  . . . [¶]

41

enforcement of the ordinance; and for monetary damages. (*White*, *supra*, at p. 1422.) The subject ordinance forbids conduct by members of the public, "which disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting."[25] (Norwalk Mun. Code, § 2.08.020(B)(3).)

The Ninth Circuit's opinion upholding the ordinance against these challenges points out the difference between remarks "uttered on the street to anyone who chooses or chances to listen," and those presented in a meeting of a legislative body such as the Norwalk City Council—or meetings of the Board. (*White*, *supra*, 900 F.2d at p. 1425.) The court explained: "A more fundamental flaw in [the] plaintiffs' position is that their first amendment arguments do not take account of the nature of the process that this ordinance is designed to govern. We are dealing not with words uttered on the street to anyone who chooses or chances to listen; we are dealing with meetings of the Norwalk City Council, and with speech that is addressed to that Council. Principles that apply to random discourse may not be transferred without adjustment to this more structured situation.

---

"3. Resisting Removal. Any person who resists removal by the sergeant-at-arms shall be charged with a violation of this section.

"4. Penalty. Any person who violates any provision of this section shall, pursuant to Section 1.[16].010, be guilty of a misdemeanor." (*White*, *supra*, 900 F.2d at p. 1424.)

[25] The ordinance included a proscription on slanderous or profane remarks, which did not apply to such remarks unless they disrupted, disturbed or otherwise impeded the orderly conduct of such a meeting. (*White*, *supra*, 900 F.2d at p. 1424.)

"City Council meetings like Norwalk's, where the public is afforded the opportunity to address the Council, are the focus of highly important individual and governmental interests. Citizens have an enormous first amendment interest in directing speech about public issues to those who govern their city. It is doubtless partly for this reason that such meetings, once opened, have been regarded as public forums, albeit limited ones. *See* [*Madison, supra,*] 429 U.S. [at p.] 175 . . . ; *Hickory Fire Fighters Ass'n, Local 2653 v. City of Hickory,* 656 F.2d 917, 922 (4th Cir.1981).

"On the other hand, a City Council meeting is still just that, a governmental process with a governmental purpose. The Council has an agenda to be addressed and dealt with. Public forum or not, the usual first amendment antipathy to content-oriented control of speech cannot be imported into the Council chambers intact. In the first place, in dealing with agenda items, the Council does not violate the first amendment when it restricts public speakers to the subject at hand. [*Madison, supra,*] 429 U.S. at [p.] 175 [f]n. 8 . . . ; *see Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985) (public forum may be created by government designating 'place or channel of communication . . . for the discussion of certain subjects'). While a speaker may not be stopped from speaking because the moderator disagrees with the viewpoint he is expressing, *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 60-61, 103 S.Ct. 948, 963, 74 L.Ed.2d 794 (1983) (Brennan, J., dissenting), it certainly may stop him if his speech becomes irrelevant or repetitious." (*White, supra,* 900 F.2d at p. 1425, fns. omitted.)

"Similarly, the nature of a Council meeting means that a speaker can become 'disruptive' in ways that would not meet the test of actual breach of the peace, *see Gooding,* 405 U.S. at 526-27, 92 S.Ct. at 1108, or of 'fighting words' likely to provoke immediate combat. See *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). A speaker may disrupt a Council meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies. The meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner. Indeed, such conduct may interfere with the rights of other speakers.

"Of course the point at which speech becomes unduly repetitious or largely irrelevant is not mathematically determinable. The role of a moderator involves a great deal of discretion. Undoubtedly, abuses can occur, as when a moderator rules speech out of order simply because he disagrees with it, or because it employs words he does not like. But no such abuses are written into Norwalk's ordinance, as the City and we interpret it. Speakers are subject to restriction only when their speech 'disrupts, disturbs or otherwise impedes the orderly conduct of the Council meeting.' So limited, we cannot say that the ordinance on its face is substantially and fatally overbroad. See *Broadrick v. Oklahoma* [, *supra,*] 413 U.S. [at p.] 615 (to invalidate statute on its face, overbreadth 'must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.')" (*White, supra,* 900 F.2d at pp. 1425-1426, fn. omitted.)

Ribakoff also relies on *Norse v. City of Santa Cruz* (9th Cir. 2010) 629 Fed.3d 966 (*Norse*).) *Norse* was a viewpoint

44

discrimination case which considered the scope of regulation which a legislative body may impose following the close of the period for public comment.  In  commenting on its earlier opinion in *White*, the *Norse* court explained:  "In *White*[, *supra*], 900 F.2d 1421 . . . , we explained that speech must 'disrupt[,] disturb[ ] or otherwise impede[ ] the orderly conduct of the Council meeting' before the speaker could be removed.  [Citation.]"  (*Norse, supra*, at p. 979 (conc. opn. of Kozinski, C.J.).)

Contentions similar to those made here were made in *Kindt v. Santa Monica Rent Control Bd.* (9th Cir. 1995) 67 F.3d 266 (*Kindt*).)  There, the Ninth Circuit upheld the rent control board's rules limiting to three minutes speakers' individual presentations to that board on agenda items, as well as a separate three-minute limit for each speaker during the separate, general public comment portion of its meetings.  In upholding these limitations on public speakers, the court reasoned:  "The Board regulations restricting public commentary to three minutes per item at the end of each meeting are the kind of reasonable time, place, and manner restrictions that preserve a board's legitimate interest in conducting efficient, orderly meetings.  *See* [*Madison, supra*,] 429 U.S. at [p.] 175 [f]n. 8 . . . ('Plainly, public bodies may confine their meetings to specified subject matter'); *Wright v. Anthony,* 733 F.2d 575, 577 (8th Cir.1984) (five-minute limitation on presentation to congressman was a reasonable restriction and served significant governmental interest in conserving time and ensuring that all had an opportunity to speak).  [The plaintiff] was not entitled to an 'equal time' response period to rebut the

views of the item 4 speakers at the moment they concluded their remarks."[26]  (*Id.* at p. 271.)

In *White,* the court pointed out the importance of placing time limits on speakers: so that the legislative business can be accomplished.  Ribakoff's arguments to the contrary—that time limits are a deprivation of his First Amendment right—are defeated by the holdings of *White, Norse* and *Kindt.*  Nor do any of the other cases which he cites lend support to his claims that time limits on public speakers at meetings of legislative bodies should be unfettered.

Although he cites *White* and *Norse,* Ribakoff rejects the holdings of these cases that there are limits to public participation in the course of meetings of bodies such as the Board, limits that include time constraints on speaking on individual agenda items, as in the present case.  Thus, Ribakoff rejects the precedent that a rule providing for three minutes per

---

[26]     Of particular note is the similarity in the description of the opportunities for persons to address the Norwalk City Council to those afforded to persons desiring to speak before the Board in the present case:  "The Norwalk City Council offers two kinds of opportunity to citizens to address the Council at meetings.  During the regular part of the meeting, citizens can sign up to speak with regard to agenda items.  Norwalk Mun. Code [former] § 2-1.1.b.3[, now § 2.08.020(B)].  During a separate portion of the meeting devoted to 'Oral Communications,' citizens may be recognized from the floor to address any topic they choose, subject to the Council's determination of relevance.  *Id.* at [former] § 2-1.1.c.2[, now § 2.08.020(C)]."  (*White, supra*, 900 F.2d at p. 1425, fn. 4.)  The Board offers similar opportunities.

speaker does not offend the First Amendment.[27]  (See *Chaffee v. San Francisco Public Library Com.* (2005) 134 Cal.App.4th 109, 115 [upholding that respondent's rule limiting speakers to "'up to three minutes'"].)

d.  <em>Content-based restriction.</em>

Ribakoff also contends that the three-minute limit on public speakers on any agenda item is a "content-based speech restriction." *Kindt* expressly rejects such a contention.  (*Kindt, supra,* 67 F.3d at p. 272.)  Nor is there any evidence to support Ribakoff's claim that his second effort to speak was denied based on what he might say.  He had already spoken for the time permitted by the Board without any evidence that his remarks had been censored.

---

[27]    In his Statement of Tentative Decision, the trial judge describes what occurred when Ribakoff attempted to speak a second time, just as the Board was going to deliberate and vote on item 10:  "[Ribakoff] at that point, rose from his seat, came to the podium and commenced speaking over the open microphone. The chair told [Ribakoff] he had already spoken for three minutes, and she said that [Ribakoff] could make his comments to staff after the meeting.  [Ribakoff] said he had not completed his comments."  The trial judge then quotes Ribakoff as stating, "I'm asking for more time.  I do have a First Amendment right to address these issues, and your time-place-manner regulation at this podium has to be reasonable.  If there is no reason to . . . interrupt my conversation, then the time-place-manner regulations are irrelevant and not enforceable.  So *on First Amendment Grounds* I ask just for a few more minutes."  (Italics added.)  The holdings of *White* and *Norse* demonstrate the error in Ribakoff's claims.

There is no evidence the reason he was not allowed more time than that permitted by the Board's rule concerned the *content* of what he might say. And, even if one accepts, arguendo, Ribakoff's premise that any temporal restriction on speech carries with it some restriction on content, such a restriction is permissible so long as the "content" restriction is "viewpoint neutral and [is] enforced that way." (*Norse, supra*, 629 F.3d at p. 975; *Kindt, supra*, 67 F.3d at pp. 270-271.) A restriction on a speaker's time to speak inevitably restricts what the speaker can say in the time allotted. Such a restriction is not per se a restriction on the substance of the remarks.

### 4. Other First Amendment Claims

Because the three minutes per public speaker rule clearly meets constitutional concerns, and there is no evidence it was applied based on the content of Ribakoff's stated or intended remarks, we do not further consider his argument that either iteration of the Board's speech rule violates the First Amendment, whether on the face of the rule or as applied.[28]

---

[28] Ribakoff also asserts the trial court erred by failing to revise its statement of decision to make 15 specific findings. The trial court declining to do so was not error. A court is not required to discuss each question listed in a party's request. All that is required is an explanation of the factual and legal basis for the court's decision regarding the principal controverted issues. (*Hellman v. La Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1230.) Ribakoff's request sought far more detail than required by Code of Civil Procedure section 632 or by California Rules of Court, rule 3.1590.

## V. Absence of Adoption of Findings Concerning the September Version of the Speech Code

Ribakoff contends the second iteration of the Board's speech rules is void because when it was put in force the Board did not "adopt[] . . . findings demonstrating the interest[] protected by the limitation and the need for protecting that interest." In making this claim, Ribakoff relies on article I, section 3, subdivision (b)(2) of the state Constitution.[29]

However, Ribakoff presents no argument of any kind in support of this claim. Instead, Ribakoff states, "Article [I] does not . . . describe what happens if a statute or court ruling lacks the required findings. *It is safe to assume* that it requires an offending statute to be declared void. If it is safe to assume that an offending statute must be declared void, then the offending judicial ruling must also be void." (Italics added.)

Ribakoff bears the burden of supporting his arguments with cogent authorities. As he has not done so, this argument is deemed waived. (*Harding v. Harding* (2002) 99 Cal.App.4th 626, 635; *Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 948 [brief without legal argument and citation to authorities on the points made may be treated as waived or abandoned].)

---

[29] California Constitution, article I, section 3, subdivision (b)(2) provides: "A statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access. A statute, court rule, or other authority adopted after the effective date of this subdivision that limits the right of access shall be adopted with findings demonstrating the interest protected by the limitation and the need for protecting that interest."

## DISPOSITION

The judgment is affirmed.  Each party is to bear its own costs on appeal.

GOODMAN, J.*

We Concur:

BIGELOW, P. J.

RUBIN, J.

_____

\*     Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JOE RIBAKOFF,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>CITY OF LONG BEACH et al.,<br><br>  Defendants and Respondents. | B279462<br><br>(Los Angeles County<br>Super. Ct. No. BC610000)<br><br>ORDER MODIFYING<br>OPINION AND CERTIFYING<br>FOR PARTIAL PUBLICATION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

  It is ordered that the opinion filed on August 24, 2018, be modified as follows:

  1.  On page 2, in the first full paragraph, delete the last sentence "We find neither statutory nor constitutional violations, and affirm."

---

\*  Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is ordered certified for publication with the exception of parts II, III, and V of the Discussion.

2.  On page 2, after the first full paragraph, insert the following as a second paragraph before Factual Background:

> In the published portions of this opinion we address the standard of review to be applied and Ribakoff's claims under the Ralph M. Brown Act (the Brown Act; Gov. Code, § 54950, et seq.) and the First Amendment, concluding that his claims lack merit.  In the unpublished portions of the opinion, we conclude that Ribakoff correctly asserted his claim under the Government Claims Act (Gov. Code, § 900 et seq.) but that that claim, his Tom Bane Civil Rights Act (the Bane Act; Civ. Code, § 52.1) claim and his assertion of a claim under article I, section 3, subdivision (b)(2) of the California Constitution, lack merit.

3.  On page 9, lines 1 to 3 are to be revised to read as follows:

> . . . he alleged violations of the Bane Act and the Brown Act, of his right to freedom of speech . . .

4.  On page 12, lines 1 and 2 are to be revised to read as follows:

> . . . that Ribakoff had failed to comply with the Government Claims Act prior to filing the lawsuit.

There is no change in the judgment.

_____

BIGELOW, P. J.              RUBIN, J.          GOODMAN, J.*

_____

*Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.